IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CHARLES RUBEN WYNN,

                     Plaintiff,

  v.                                            OPINION and ORDER

LUCAS WOGERNESE, THOMAS MAIER,          18-cv-333-jdp
DUSTIN ROHWER, DANIEL FIELDS,
DANIEL DREGER, and DANIEL FRISCH,

                     Defendants.

---

Pro se plaintiff Charles Ruben Wynn is an inmate at Columbia Correctional Institution (CCI). He alleges that a CCI psychologist retaliated against him for saying that he was feeling suicidal by refusing to provide him with a mattress while in clinical observation. This triggered an episode in which Wynn spent several hours biting his own wrists in what he describes as an attempt to commit suicide. Wynn alleges that other CCI officials knew that he was suicidal and refused to take reasonable measures to prevent him from harming himself. He asserts a First Amendment retaliation claim against the CCI psychologist and Eighth Amendment claims against the CCI officials who he says ignored his suicide attempt.

Defendants have moved for summary judgment. Dkt. 43. Wynn has filed a motion for leave to file a sur-reply in opposition to defendants' summary judgment motion, Dkt. 76; a motion to strike, Dkt. 79; and a motion for sanctions, Dkt. 81. For the reasons explained below, I will deny Wynn's motions, grant defendants' motion for summary judgment, and dismiss the case.

PRELIMINARY MATTERS

I begin with Wynn's three motions, as they affect what I will consider for purposes of summary judgment.

First, Wynn asks for leave to file a sur-reply in opposition to defendants' summary judgment motion to address issues raised for the first time in defendants' reply brief. Specifically, Wynn says that defendants argue for the first time that Wynn "engaged in a game of 'cat-and-mouse'" that forced defendants to "tread a fine line" between preventing Wynn from engaging in self harm and deploying excessive force. Dkt. 76, at 1. Wynn says that defendants never mentioned cat-and-mouse games or excessive force in their opening brief, but he is incorrect. In their opening brief, defendants argued that if Wynn's view of the law prevailed:

> correctional officers would be placed in a Catch-22 in which they risk deliberate indifference by not using pepper spray every time an inmate threatens to harm himself, while at the same time running the risk of violating an inmate's right to be free from the use of excessive force by pepper spraying an inmate who poses no threat to himself.

Dkt. 44, at 18. Defendants didn't use the phrase "cat-and-mouse," but it is the same argument. So I will deny Wynn's request for leave to file a sur-reply.

Second, Wynn asks me to strike (or order defendants to supplement) some of their replies in support of their own proposed findings of fact, Dkt. 75. Wynn did not separately file his own proposed findings of fact as a supplement to those proposed by defendants, as required under Procedure II.B of this court's summary judgment procedures. Instead, he raised additional proposed facts in his responses to defendants' proposed findings of fact. *See* Dkt. 67. Defendants replied to many of Wynn's responses by asserting that Wynn did "not sufficiently dispute th[e] proposed finding of fact and the cited evidentiary material does not

2

support his purported dispute." Wynn asks me to: (1) construe his responses to defendants' proposed findings of fact as his own additional proposed findings of fact; (2) order defendants to respond to Wynn's responses as if they were separate proposed findings of fact or treat Wynn's responses as undisputed; and (3) strike certain of defendants' replies to Wynn's responses as unclear, vague, or in need of further clarification or, in the alternative, order defendants to provide a more definite statement under Federal Rule of Civil Procedure 12(e).

I will deny all three requests. As to the first two requests, it was Wynn's obligation to follow this court's summary judgment procedures. I will not order defendants to make up for Wynn's failure to do so. As to the third request, Wynn is correct that some of defendants' replies are boilerplate, pointing out technical deficiencies rather than engaging with the merits of Wynn's allegations. But they are also accurate: many of Wynn's responses proposed additional facts rather than engaging with the facts that defendants had proposed. So I will not strike defendants' replies or order defendants to supplement them under Rule 12(e).

Despite Wynn's failure to provide separate proposed findings of fact, I have considered some additional facts that Wynn incorporated into his response to defendants if those facts were supported by evidence. But some of Wynn's responses to defendants' proposed findings of fact are improper. There are several instances where defendants propose a finding of fact based on a declaration from the record, and Wynn attempts to dispute the fact by asserting that there are "no admissible documents to support" the fact in question. *See, e.g.*, Dkt. 75, ¶¶ 41, 47, 49, 54, 90. Declarations are admissible documents. *See* 28 U.S.C. § 1746. Contrary to Wynn's assertions, defendants need not submit a "policy and procedure" document corroborating a declarant's description of an institutional policy or practice. *Id.* ¶ 90. Declarants are free to testify to matters about which they have personal knowledge. Fed. R.

Evid. 602. So I will not consider Wynn's responses to these proposed findings of fact in my summary judgment analysis.

Wynn's third motion asks me to sanction defendants for failing to respond to the two motions discussed above. Dkt. 81. But I did not set briefing on those motions, so defendants were under no obligation to respond.

UNDISPUTED FACTS

The following facts are undisputed except where noted.

On the morning of November 7, 2017, Wynn reported to defendant Dr. Daniel Frisch, a CCI psychologist, that he was having thoughts of suicide. Frisch asked Wynn about the nature of his suicidal ideation, but Wynn didn't provide any additional detail other than that he was suicidal and needed "to go on obs[ervation status]." Dkt. 75, ¶ 21. So Frisch placed Wynn in clinical observation status, a restrictive status used for the purpose of preventing an inmate from hurting himself or others.

Inmates in observation status are placed in observation cells and checked on by prison staff at least every 15 minutes throughout the day and night. Observation cells are sparsely furnished with a metal bed secured to the floor, a sink, and a toilet. Any property that an inmate might use to injure himself is removed. Under institution policy, inmates retain only: suicide-resistant clothing (such as a smock, gown, or kilt); a security mat or mattress; bar or liquid soap and a washcloth; bag meals; toilet paper; health and psychological service requests forms; and a crayon for completing those forms. The staff member placing the inmate in observation status is responsible for determining which of these items an inmate will be permitted to maintain based on his or her assessment of the inmate's behavior and the degree

4

of risk. For instance, Frisch says that if an inmate indicates thoughts or a plan to hang himself, Frisch won't allow that inmate to have sheets, non-suicide resistant clothing, or any other property items that might be used in an attempt to hang oneself.

When Frisch placed Wynn on observation status, he authorized Wynn to have only a paper smock to start with. The parties dispute what motivated Frisch's decision to impose such strict limits on Wynn's property. Frisch says he was motivated by concern about Wynn's refusal to provide details about any plan for self-harm or suicide, as well as his knowledge that Wynn had been on observation status only two weeks before. He says that had Wynn reported thoughts of cutting himself, he likely would have authorized a mattress and other "soft" property that he wouldn't be able to cut himself with. *Id.* ¶ 28. But because Wynn wouldn't explain the nature of his suicidal thoughts, Frisch decided to err on the side of less property, at least until staff could reassess him to determine whether it would be safe to allow more. Wynn says that Frisch wasn't concerned about his health or safety, but rather by a desire to make him as uncomfortable as possible while in observation. *Id.* ¶ 25. He alleges that Frisch acted "out of retaliation for Wynn making back to back obs placements" and "also to deter Wynn from expressing thoughts of self-harm or suicide in the future." *Id.* ¶ 29.

Once Wynn was in observation status with limited property, Frisch determined that "close observation" (where inmates are checked on every 15 minutes) rather than "constant observation" (where an officer is stationed outside an inmate's cell) was appropriate. Frisch did not have further contact with Wynn on November 7 because the observation cells are located on the Restrictive Housing 1 (RH1) unit, and Frisch was assigned to a different unit.

Wynn's first several hours in observation passed without incident. As the day wore on, Wynn began asking for a mattress. Security staff do not have authority to provide inmates in

5

observation status with additional property; instead, property must be authorized by psychological services unit (PSU) staff. When he learned that PSU staff would not authorize him a mattress, Wynn began experiencing "great emotional stress" that he says caused him to start "gnawing flesh from his wrist in [an] attempt to c[au]se significant harm to himself." *Id.* ¶ 105.

The officer responsible for conducting observation checks during that time was defendant Dustin Rohwer, a correctional officer. At approximately 4:45 p.m., Rohwer noticed that Wynn was biting his left wrist and had given himself what Rohwer described as a superficial wound approximately one-quarter inch in length. He does not recall whether the wound was or had been bleeding. Wynn disputes the accuracy of Rohwer's recollection and contends that the wound was in fact "dime sized" and that it was actively bleeding at the time Rohwer saw it. *See id.* ¶ 46.

Under prison policy, correctional officers have a duty to stop prisoners from engaging in self-harming activity using the least amount of force they reasonably believe necessary to control the situation. As a correctional officer, Rohwer didn't have authority to enter Wynn's cell in the absence of an instruction from a supervisor. But he did have authority to engage in a show of force from outside of Wynn's cell. Rohwer told Wynn that he would have to spray him with pepper spray if he didn't stop biting himself. Wynn stopped biting, but he told Rohwer, "As soon as you walk off, I'm biting myself." Dkt. 24 (Wynn Dep. 12:3). Rohwer had other individuals to check on, so he continued with his other duties while continuing to monitor Wynn for any change in his activity. Wynn says that he resumed biting himself after Rohwer walked away and continued to do so "for like an hour or so." *Id.* at 12:6. Rohwer noted in Wynn's observation log that at 5:00 p.m., Wynn was "continuing to bite at [his] superficial

6

wound." Dkt. 51-1, at 8. At 5:15, defendant Thomas Maier, a correctional sergeant, came to speak with Wynn at his cell door, asking about why he was biting himself and directing him to stop. After observing Wynn's bite wound and instructing him to stop, Maier returned to the sergeant's cage to continue monitoring the activity on the unit.

As all of this was happening, word of Wynn's actions was being passed up the chain of command. Rohwer notified defendant Daniel Dreger, a correctional officer, who in turn notified defendant Lucas Wogernese, a captain, that Wynn was threatening to harm himself and had bitten his left wrist, leaving a superficial cut. Wogernese says that he sent Kenneth Cornelius (a lieutenant who is not a defendant in this case) to evaluate Wynn, and that Cornelius checked on Wynn around 5:30 p.m. Wynn disputes that Cornelius came to check on him at 5:30 p.m. *See* Dkt. 75, ¶ 60.

Wynn's dinner tray was delivered, and he stopped biting himself so that he could eat. At 5:45, Rohwer noted in Wynn's observation log that he had eaten 75 percent of the food on his tray. Around 6:15, defendants Dreger and Daniel Fields, another correctional officer, were collecting the trays when Wynn stuck his hand out of the trap in his cell door and stated, "I'm not pulling my arm in until a nurse come[s to] give me medical treatment." *Id.* ¶ 63. Wynn says he did this because he wanted to "leak blood on the hallway floor . . . if and when[] [he] struck [an] artery." Dkt. 64, ¶ 24. He also says that he was already "dripping blood everywhere" and that Fields and Dreger saw this. *Id.* Dreger and Fields don't address whether Wynn was actively bleeding in their declarations. Fields says that it was his understanding that a supervisor had already been notified of the situation, Dkt. 75, ¶ 65, and Dreger says that he told Wynn so, *id.* ¶ 64.

7

Wynn continued holding open his trap for the next two hours. At 6:45 p.m., Rohwer noticed that Wynn had given himself a second superficial wound on his other wrist while continuing to hold his trap open. (Wynn disputes Rohwer's characterization of the wound as "superficial." *Id.* ¶ 68.) Rohwer, Dreger, and Fields say that they "were able to monitor Wynn and notify the sergeant and the supervising officers of Wynn's activity" during this time. *Id.* ¶ 76. But it isn't clear whether they did in fact update the supervising officers about Wynn's status; none of them specifically assert that they did, and the contemporaneous observation logs make no mention of supervisors being notified that Wynn was continuing to self harm and had bitten his other wrist. Rohwer says that he "reasonably believed at the time that [his] presence and dialogue with Wynn were enough to stop" Wynn's self-harming activities. Dkt. 56, ¶ 19.

A little after 8:00 p.m., Wogernese came to the observation unit and spoke with Wynn at his cell. Wynn was still refusing to remove his arm from the trap and requesting medical care. Wogernese saw what he described as a superficial laceration on Wynn's wrist that was not actively bleeding. Wynn again disputes this characterization of his injury. *See* Dkt. 75, ¶ 82. Wogernese offered Wynn bandages, which Wynn declined. Because Wogernese deemed Wynn's injuries superficial and because Wynn still wouldn't remove his arm from the trap, Wogernese opted not to have Wynn evaluated by nursing staff. Wogernese then delegated the task of handling Wynn's refusal to remove his arm from the trap to Cornelius and left the unit.

Wynn continued to hold open his trap until 8:40, when Cornelius ordered staff to take Wynn to the "due process room" on the unit so that bandages could be applied to his wrists. Cornelius then called Heather Schwenn, a psychologist who was the on-call clinician that night. Cornelius informed Schwenn that Wynn had bitten his arm and that it bled, but that the

8

wound was not deep. Schwenn and Cornelius discussed the option of placing Wynn in a restraint suit and applying "hand cans" to prevent him from biting himself again. They ultimately decided against it because they believed that Wynn was simply upset that Frisch authorized him to have only a paper smock when placing him in observation status. Cornelius then talked to Wynn for a while until Wynn eventually agreed to stop threatening to harm himself. Wynn told Cornelius that he was "ready to go back to [his] room and [was] going to chill for the rest of the night if [he] could." *Id.* ¶ 92.

Wynn remained in the due process room until 10:30 p.m., when he was returned to his cell. He was fine until around midnight, when he noticed that blood was leaking through the bandage on his right wrist. Lieutenant Loden, a non-defendant, removed Wynn from his cell to re-bandage his arm. As Wynn was being escorted back to his cell, he became upset and started trying to rip off his bandages. At 1:00 a.m., Loden called Schwenn to inform her that Wynn was again threatening to bite his arms and wrists. At that point, Schwenn determined that security staff should place Wynn in the restraint suit and hand cans, which made it physically impossible for Wynn to continue to bite himself. Once Wynn had been placed in the restraint suit and hand cans, he ceased threatening to engage in self harm.

ANALYSIS

In my screening order, Dkt. 9, I allowed Wynn to proceed on: (1) a First Amendment retaliation claim against Frisch, based on Wynn's allegation that Frisch refused to authorize him a mattress in observation to punish Wynn for stating that he was feeling suicidal and needed to go to observation; and (2) Eighth Amendment claims against Rohwer, Maier, Fields, Dreger, and Wogernese based on Wynn's allegations that they were aware of his mental

9

anguish, risk of self-harm, and physical injuries, and that they refused to provide him with appropriate care. Defendants move for summary judgment on all claims. For purposes of evaluating defendants' motion, I must view disputes of fact in the light most favorable to Wynn. But this treatment does not extend to inferences supported only by speculation or conjecture. *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). To survive summary judgment, Wynn must identify specific, admissible evidence showing that there is a genuine dispute of material fact for trial. *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).

A. **First Amendment retaliation claim**

To survive summary judgment on his First Amendment retaliation claim, Wynn must put forward evidence from which a reasonable jury could find that (1) he engaged in speech or other activity that was protected by the First Amendment; (2) he suffered a deprivation or injury that would likely deter First Amendment activity in the future; and (3) there was a causal connection between the two. *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018). More specifically, Wynn must show that Frisch acted "out of a desire to prevent [him] from engaging in [the] activity that the First Amendment protects." *Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412, 1418 (2016).

Even if I assume that Wynn's statements to Frisch were protected by the First Amendment and that being denied a mattress is the type of deprivation that would deter First Amendment activity, Frisch would still be entitled to summary judgment because Wynn has produced no evidence that Frisch denied him a mattress out of a desire to prevent Wynn from making statements about suicide in the future. Wynn speculates that Frisch "was annoyed that Wynn was consistently requesting to be placed on clinical obs." Dkt. 66, at 3. But a mere

"hunch about the defendant's motives" isn't enough to survive summary judgment. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

The uncontroverted evidence here shows that Frisch restricted Wynn's property in observation to protect Wynn from self-harm. Wynn would not disclose any details about the nature of his suicidal ideation, so Frisch could not determine whether it might have been safe to authorize Wynn a mattress or other soft property. Wynn says that a jury could infer that this wasn't Frisch's real reason for denying the property because "a prisoner cannot cut or hang [himself] with a mattress or regular security smock." Dkt. 66, at 3. But Frisch contends that the mattress and smocks given to observation inmates are designed to be tear-resistant, not tear-proof, so inmates could conceivably rip them up and use the pieces to engage in self harm. Wynn tries to dispute this. *See* Dkt. 75, ¶ 16 (Frisch's assertion that an inmate could tear a mattress or smock to self harm is just "the personal opinion of Dr. Frisch" and is unsupported by "admissible documents or information"). Frisch doesn't explain the foundation for his assertion that the mattresses are tear-resistant, but it is not defendants' burden to show that the mattresses can be torn. Rather, it is Wynn's burden to show that the mattresses are in fact impossible to tear and thus pose no real risk. Wynn does not make this showing.

There is no evidence in the record that Frisch's asserted reason for denying Wynn a mattress was pretextual or that his true motives were retaliatory. So I will grant summary judgment to Frisch on Wynn's First Amendment retaliation claim.

## B. Eighth Amendment claims

To survive summary judgment on his Eighth Amendment claims, Wynn needs to provide evidence from which a reasonable jury could find that the defendants knowingly and unreasonably failed to respond to an objectively serious risk of harm. *See Farmer v. Brennan*,

11

511 U.S. 825, 834 (1994). When the serious risk at issue is attempted suicide, a defendant acts knowingly and unreasonably if that defendant "(1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded that risk." *Lisle v. Welborn*, 933 F.3d 705, 716–17 (7th Cir. 2019) (quoting *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006)). This requires "more than mere or gross negligence, but less than purposeful infliction of harm." *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003).

Wynn identifies various points at which he says Rohwer, Maier, Dreger, Fields, and Wogernese could have intervened more directly to prevent him from biting himself. Defendants contend that Wynn can't demonstrate that he ever faced an objectively serious risk of serious harm because he wasn't actually suicidal, but rather was engaging in a show of self harm solely to manipulate prison staff into giving him property. I need not resolve questions about the authenticity of Wynn's acts of self harm, because his claims fail for a different reason: he has produced no evidence that any of the five defendants intentionally disregarded a risk that he would harm himself. Rather, the evidence shows that defendants monitored Wynn closely to ensure that he did not seriously injure himself and took measures to restrain him once less restrictive measures had failed.

Wynn points to various actions that he says defendants should have taken to prevent him from engaging in self harm. He asserted in his deposition that Rohwer and the other correctional officers should have "stood at the door and watch[ed him to] make sure" he didn't continue harming himself, and that Rohwer could have sprayed Wynn with pepper spray to make him stop. Dkt. 42 (Wynn Dep. 25:5–6, 14; 26:6–8, 13). Wynn also said that Maier "should have told Fields and Dre[]ger to cuff [Wynn] up and place [him] in the shower with a tether on," *id.* at 25:18–21, and that Wogernese should have personally evaluated Wynn

12

immediately upon learning about Wynn's self harm at 5:00 p.m. *Id.* at 27:2–5. Ultimately, Wynn believes that he should have been placed in the restraint suit and hand cans earlier than he was. *Id.* at 33:9–17.

But the relevant question under the Eighth Amendment is not whether Wynn received the intervention of his choice, or even the most effective intervention possible. The question is whether defendants took reasonable measures to address a substantial risk of serious harm. *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Here, defendants took such measures. Far from ignoring Wynn, Rohwer notified his supervisors of the situation and proceeded to check on Wynn every fifteen minutes, in accordance with Frisch's close-observation order. Rohwer saw that Wynn was making small wounds on his wrists, but at no point did he determine that Wynn had a medical emergency requiring immediate and aggressive intervention. Dkt. 75, ¶ 100. Wynn was not excessively bleeding, and he continued to engage with staff throughout the afternoon and evening. In the end, Wynn's injuries were limited to two dime-sized wrist wounds that did not require medical care beyond the application of bandages, so the assessment made by Rohwer and his supervisors turned out to be accurate. Under those circumstances, no reasonable jury would conclude that defendants intentionally disregarded Wynn's risk of suicide. *See, e.g., Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) (no Eighth Amendment liability where defendant did not "sit idle" when prisoner told him he was suicidal, but informed the control room and repeatedly checked in on him).

As for their affirmative efforts to stop Wynn from biting himself, defendants decided to start with less restrictive tactics (ordering Wynn to stop and threatening him with pepper spray) before taking more aggressive action (removing Wynn from his cell and placing him in the restraint suit and hand cans). This was reasonable. Unlike a prisoner with a contraband

13

razorblade or makeshift noose, no reasonable jury would conclude that Wynn was at substantial risk of inflicting grievous injuries on himself using his own teeth. *See State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983) (Eighth Amendment is violated only where there is a strong likelihood, rather than a mere possibility, that serious harm will occur). And whereas blades and nooses can be confiscated, prison officials are in a tougher position when a prisoner threatens to self-harm using his own body. Under such circumstances, it was appropriate for defendants to first try less aggressive strategies before fully immobilizing Wynn. *See, e.g.*, *Brown v. Wogernese*, No. 16-cv-34-jdp, 2017 WL 395229, at *4 (W.D. Wis. Jan. 27, 2017). Indeed, reacting more aggressively under these circumstances might have made defendants susceptible to claims of excessive force. *See, e.g.*, *Barrett v. Wallace*, No. 12-cv-24-bbc, 2013 WL 4483063, at *8–9 (W.D. Wis. Aug. 20, 2013) (addressing excessive-force claims arising out of use of pepper spray to immobilize a suicidal inmate).

None of the actions or inactions that Wynn has identified provide sufficient basis for a jury to find in his favor. Wynn was placed in a controlled environment where he was able to do only minor damage to himself, and he was monitored closely by prison staff. The Eighth Amendment doesn't require more than that. I will therefore grant defendants' motion for summary judgment on Wynn's Eighth Amendment claims.

ORDER

IT IS ORDERED that:

1. Plaintiff Charles Ruben Wynn's motion for leave to file a sur-reply, Dkt. 76, is DENIED.

2. Plaintiff's motion to strike, Dkt. 79, is DENIED.

3. Plaintiff's motion for sanctions, Dkt. 81, is DENIED.

4. Defendants' motion for summary judgment, Dkt. 43, is GRANTED.

5. The clerk of court is directed to enter judgment for defendants and close this case.

Entered November 25, 2019.

        BY THE COURT:

        /s/

        _____
        JAMES D. PETERSON
        District Judge